IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 1, 2012 Session

IN RE ZACHARY G., ET AL.

Appeal from the Juvenile Court for Campbell County
No. JUV2010-508    Hon. Joseph M. Ayers, Judge

No. E2011-01246-COA-R3-PT - Filed March 2, 2012

This is a termination of parental rights case in which the Tennessee Department of Children's Services ("DCS") removed Zachary G. and Kaleb M. (collectively the "Children") from Heather M. ("Mother") and Elmus G. ("Father").[1]  The Children were adjudicated dependent and neglected and placed with Rhonda S. ("Grandmother").  Years later, the Children were placed in foster care and two new permanency plans were entered.  DCS then petitioned to terminate Mother's parental rights.  Following a hearing, the court terminated Mother's parental rights, finding that Mother had abandoned the Children, that Mother had failed to substantially comply with the permanency plans, and that termination of Mother's parental rights was in the best interest of the Children.  Mother appeals.  We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

Lauren R. Biloski and Kevin C. Angel, Oak Ridge, Tennessee, for the appellant, Heather M.

Robert E. Cooper, Jr., Attorney General and Reporter, and Shanta J. Murray, Assistant Attorney General, General Civil Division, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1]Father was referred to as Travis G. in various parts of the record.  However, the petition for termination listed Father's name as Elmus Travis G.

Darren Fred Mitchell, LaFollette, Tennessee, guardian ad litem for the minors, Zachary G. and Kaleb M.

**OPINION**

**I. BACKGROUND**

Alexis G., Zachary G., and Kaleb M. were born to Mother and Father (collectively the "Parents") on July 31, 2003, March 26, 2006, and June 19, 2007, respectively. Alexis G. was not included in the petition to terminate parental rights that is at issue in this case. Father voluntarily surrendered his rights to Zachary G. and Kaleb M. Therefore, the factual background will mostly contain information pertaining to Mother.

Prior to Kaleb M.'s birth, DCS petitioned the court for removal and temporary custody of Alexis G. and Zachary G., alleging that the Parents had been arrested. DCS asserted that Alexis G. and Zachary G. had been found in a dwelling that contained a methamphetamine lab. Alexis G. and Zachary G. were subsequently found to be dependent and neglected and were placed with Grandmother. A permanency plan was implemented for each child that included the dual goals of reunification with the Parents or placement with relatives. The plans included a section advising the Parents on the criteria and procedures for termination of parental rights. The Parents signed the plans and the listing of the criteria and procedures for termination. Pursuant to the plans, Mother was instructed to "provide a safe [and] stable drug-free home - that [wa]s free of any domestic violence" and "to live a life that [wa]s free of criminal court involvement." Mother was advised, in pertinent part, that she needed to

1. Follow all recommendations of the alcohol and drug assessment.

2. Submit to random drug screens.

3. Attend a mental health assessment to work on depression from the past four years, past anger issues, and to deal with past domestic violence and follow recommendations from the assessment.

4. Provide proof of stable housing, live at that residence for at least four months, and provide proof of legal income to DCS case manager.

5. Resolve all legal issues.

On May 31, 2007, the court reviewed and approved the permanency plans. The court found that DCS was making reasonable efforts to reunify Alexis G. and Zachary G. with the

Parents but that the Parents were not in compliance with the plans. Two months later, DCS petitioned the court to include Kaleb M., who had just been born, in the petition for removal and custody. DCS alleged that the conditions that led to removal still existed and that Kaleb M. should also be removed. The trial court agreed and designated Grandmother as the legal and physical custodian of all three children.

In April 2009, Grandmother kept Alexis G. but gave the Children to her sister, Suzanne S. Two months later, Suzanne S. was granted custody of the Children. Three months later, Suzanne S. returned the Children to Grandmother. Citing problems with her health, Grandmother gave the Children to the paternal grandfather ("Grandfather"). DCS petitioned the court for an immediate protective custody order providing placement of the Children with Grandfather.

In October 2009, the trial court designated Grandfather as the custodian of the Children, finding that there was "probable cause that the [C]hildren [were] dependent and neglected," that it was "contrary to the welfare of the [C]hildren to remain in the custody of their parents," and that placement with Grandfather was in the Children's best interest. In so finding, the court noted that Mother had been released from jail and placed on probation but was at a rehabilitation facility receiving treatment for substance abuse issues.

In November 2009, DCS petitioned for review of the case regarding the appropriateness of the placement with Grandfather, who had been arrested for public intoxication and had pled guilty to the charge. Two months later, the court affirmed the continued placement of the Children with Grandfather, citing the fact that DCS approved the placement because Grandfather was compliant with DCS involvement and was utilizing the services provided by DCS.

In February 2010, DCS petitioned for removal of the Children, alleging that Grandfather reported that he was unable to continue caring for them. DCS noted that Father was in prison serving a sentence for first degree murder and that Mother was residing in a halfway house. DCS requested an immediate protective order placing custody of the Children with DCS. The trial court agreed and entered a protective custody order. In the preliminary hearing order filed approximately one month later, the court found that it was contrary to the Children's welfare "to remain in the care, custody, or control of their [P]arents and legal custodian," that placement of the Children with DCS was in the best interest of the Children, "that reasonable efforts were made to prevent removal of the [C]hildren, [and] that reasonable efforts have been made since removal to reunify the family."

Permanency plans for the Children were entered on March 16, 2010, providing dual goals of reunification or placement of the Children with relatives. Mother was instructed that

the Children needed a "safe [and] stable living environment" and a "safe [and] stable permanent home." Mother was advised that in order to regain custody, she needed to

    1. Provide a safe and stable drug-free home.

    2. Provide verification of rent receipts and legal utilities for three months.

    3. Maintain a stable income and provide verification of that income.

    4. Maintain reliable transportation.

    5. Refrain from illegal activity.

    6. Resolve restitution and provide verification that restitution had been resolved.

    7. Remain drug free.

    8. Prohibit persons under the influence of illegal drugs or alcohol from coming near the Children.

    9. Verify completion of an eight-week parenting program.

DCS noted that Mother had completed a four-month intensive outpatient program, had participated in weekly alcohol and drug group counseling, and had attending parenting classes. Mother signed the permanency plans. Mother also signed the criteria and procedure for termination of parental rights that were attached to the permanency plans.

In March 2010, April 2010, and May 2010, Jessica Brown, a Family Service Worker with DCS, submitted affidavits of reasonable efforts, relating that she had been providing services to Mother and the Children. She alleged that placement of the Children with Mother would not occur until Mother completed parenting classes, obtained stable housing, maintained a stable income and transportation, and followed the rules of aftercare relating to Mother's alcohol and drug treatment.

On May 13, 2010, a hearing was held at which Mother was present. Following the hearing, the court adjudicated the Children as dependent and neglected and awarded custody of the Children to DCS in an order entered on June 24, 2010. Shortly thereafter, the court approved the March permanency plans and found that the Parents were not in compliance with the plans. The court listed the services that had been provided by DCS and found that

DCS was in compliance with plans. However, the court stated that "DCS [was] not making reasonable efforts toward finalizing the permanency goal(s) by providing the services referred to" in the list.[2]

Mother tested positive for opiates on May 24, 2010. Mother's probation was revoked, and she was ordered to serve her sentences for one Class D felony, three Class E felonies, and one Class A misdemeanor. In October 2010, DCS filed a petition to terminate the parental rights of Mother. DCS contended that Mother had been ordered to serve an effective five-year sentence[3] because she had violated her probation. DCS argued that termination of Mother's parental rights was appropriate based upon the ground of abandonment and substantial noncompliance with the permanency plans.

Relative to abandonment, DCS opined that Mother had been in jail for "part or all of the four months just before" the petition was filed, that she had been engaged in conduct that exhibited a "wanton disregard for the [C]hildren's welfare by violating her probation by testing positive for opiates . . . and [by] only making one $100.00 payment toward[] her restitution in 2009[] and one $10.00 payment in 2010." DCS asserted that Mother's "criminal conduct and continued drug use led to her further incarceration, guaranteeing further estrangement from [the Children]."

Relative to substantial noncompliance with the permanency plans, DCS related that Mother had been given until September 16, 2010 to satisfy the requirements in the permanency plans. DCS stated that Mother signed the plans and that the plans were ratified by the court. DCS argued that Mother failed to remain drug free, failed to refrain from illegal activity, and failed to maintain a stable and safe drug-free home. DCS contended that Mother's incarceration meant that she would be "unable to provide a home for the [C]hildren" and that she would be unable to "maintain housing, transportation, or employment."

DCS asserted that it had made reasonable efforts to assist Mother in reuniting with the Children but that Mother failed to utilize the services offered by DCS. DCS opined that it was in the Children's best interest to terminate Mother's parental rights because she had not made changes in her conduct or circumstances. DCS contended that a lasting change in Mother's lifestyle or conduct did not appear possible and that Mother's inability to refrain

---

[2]We believe that this notation was likely a clerical error. This issue will be discussed later in the opinion.

[3]Mother alleged that she was ordered to serve a four-year sentence. The record is unclear as to Mother's actual sentence.

from drugs rendered her "consistently unable to care for the [C]hildren in a safe and stable manner."

A hearing on the termination petition was held on March 10, 2011. Mother testified that she had not seen the Children since her visit with them at DCS in May 2010. She admitted that the Children had not been in her custody since 2006 but asserted that she had provided for them until she was incarcerated in 2010. She had been on probation since 2007 and had been incarcerated for short periods while on probation. Prior to her 2010 relapse, she was in a rehabilitation facility for four months and a halfway house for approximately five months. She recalled that DCS met with her in February 2010 and encouraged her to remain in the halfway house and complete the program. She remembered that DCS followed up with the halfway house on her treatment progress and facilitated visitation with the Children once a week when she came to the offices to take a drug test. She moved out of the halfway house in April 2010 and tested positive for opiates approximately one month later. She said that she had remained drug free for approximately one year before her relapse. She admitted that she had failed some drug tests prior to her year of sobriety. She realized that failing a drug test could result in her incarceration. She admitted that she had signed permanency plans that required her to refrain from using drugs but asserted that she did not realize that failing a drug test could result in the termination of her parental rights.

Mother admitted that once she was incarcerated, she could not provide a stable home for the Children. She said that she could possibly provide some child support from pay she received for jobs she held while incarcerated. She had not paid any child support at the time of the hearing but stated that she did not know "how to do any of that." She asserted that since her incarceration, Ms. Brown had not put forth any effort to help her fulfill the requirements contained in the parenting plans and had not even brought the Children for visitation. Approximately two weeks before the hearing, she sent Ms. Brown a letter requesting an address for the Children. She had not called Ms. Brown since her incarceration because she did not know whether she could call DCS from the prison telephones without requesting approval.

Mother said that she had served nine months of her four-year sentence and that during that time, she had completed a parenting class, a substance abuse program, and had started an intensive drug rehabilitation program. She opined that she would complete the program before she was eligible for parole in October 2011. She stated that once paroled, she would move into a halfway house that provided an 18-month program that would help her find employment and would also provide counseling for her and the Children. She asserted that while she could not live with the Children during that time, she would have the ability to contact them and to continue to fulfill the requirements contained in the permanency plans. She related that once she left the halfway house, she would find a home in which she could

care for the Children. She said that she did not have to stay at the halfway house for 18 months but that she could stay as long as 18 months if necessary. She insisted that she would not relapse again because she had "a taste of what life's supposed to be" and because she did not want to return to prison.

Ms. Brown testified that she received Mother's case when the Children were removed from Grandfather's custody in February 2010. She filed the petition to terminate Mother's parental rights five months after Mother tested positive for opiates and was incarcerated for violating her probation. She believed that Mother had exhibited a wanton disregard for the welfare of the Children by failing a drug screen while "knowing that the consequences would be a violation of her probation, which would result in incarceration." She also believed that Mother had failed to substantially comply with the requirements contained in the permanency plans, which were developed in March 2010. She recalled that Mother was present when the permanency plans were developed and agreed to the requirements contained in the plans. She admitted that Mother attended parenting classes but asserted that Mother failed to complete several of the requirements, two of the most important being to remain drug free and to maintain stable housing. She related that Mother left the halfway house and moved into a transitional living program, where she was supposed to work and save funds to access housing. Instead, Mother was incarcerated one month later.

Relative to her efforts in assisting Mother, Ms. Brown testified that she developed the permanency plans with Mother and that she reviewed what services Mother would need in order to fulfill the requirements. She ensured that Mother had access to those services through the halfway house and then ensured that the transitional living program provided services to Mother related to her substance abuse problem. She scheduled Mother's visitation with the Children and even provided transportation on one occasion in order to facilitate Mother's visitation with the Children. She asserted that all of the requirements contained in the plan were related to remedying Mother's substance abuse problem and avoiding incarceration.

Ms. Brown stated that she visited Mother at the Campbell County Jail, where they discussed the setbacks they faced because of the probation violation. She recalled that Mother did not ask about contacting the Children and that she did not advise Mother on how to submit child support or how to contact the Children. She also did not facilitate Mother's visitation with the Children once Mother was incarcerated because she "didn't feel it was in the best interest of the [C]hildren" to visit Mother in prison. She explained that facilitating visitation would have required extensive travel for the Children because Mother was housed in Nashville, approximately four hours away from the Children. She acknowledged that the Children would likely have a stronger bond with Mother if she had facilitated visitation. She admitted that she did not adjust the permanency plan because of Mother's incarceration. She

opined that Mother had access to services while incarcerated that would help her fulfill the requirements and that she told Mother to utilize those services. She acknowledged that Mother had utilized those services while incarcerated.

Ms. Brown asserted that at the time she filed the petition to terminate Mother's parental rights, Mother did not have a close relationship with the Children because the Children had been residing in a foster home for approximately seven months. She said that the Children had "developed a bond with [the] foster parent[s]" and were receiving the care that they needed. She testified that after she filed the petition to terminate Mother's parental rights of the Children, Alexis G. was taken into DCS custody. She opined that DCS would attempt to facilitate visitation between Alexis G. and the Children. She admitted that Alexis G. had only visited with the Children on one occasion in the past 13 months. She alleged that she had been unable to facilitate visitation because of Grandmother's resistance.

Following the hearing, the court held that DCS had met its "burden of proving by clear and convincing evidence that [Mother] had engaged in conduct prior to incarceration that exhibited a wanton disregard for the welfare of the [C]hildren and, as a result, that the [C]hildren [had been abandoned] pursuant to [Tennessee Code Annotated section] 36-1-102(1)(A)(iv)." In so holding, the court noted that Mother "had been incarcerated on at least one prior occasion in 2006, that she had a long-standing substance abuse problem, that she had engaged in criminal behavior, and that she had violated the terms of her probation[.]" The court also held that Mother had failed to substantially comply with the requirements contained in the permanency plans. The court found that termination of Mother's parental rights was in the best interest of the Children. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal by Mother as follows:

A. Whether there was clear and convincing evidence to establish that Mother abandoned the Children.

B. Whether there was clear and convincing evidence to establish that Mother failed to substantially comply with the requirements of the permanency plans.

C. Whether there was clear and convincing evidence to establish that DCS used reasonable efforts to assist Mother in fulfilling the requirements of the permanency plans.

D. Whether there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the Children.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

> (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No.

M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004).

> Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010).

## IV. DISCUSSION

### A.

Mother asserts that DCS failed to prove that she exhibited a wanton disregard for the welfare of the Children. She notes that she had only one set of criminal charges arising from a single act in 2006 that occurred prior to Kaleb M.'s birth and that she had only failed one drug screen in the year prior to her incarceration. She argues that the evidence presented "hardly represent[ed] a pattern of willful conduct" toward the Children when she accepted

the consequences of her actions and "was doing her best to remedy the situation" by seeking treatment. DCS responds that Mother's "conduct prior to incarceration clearly evidenced a wanton disregard for [the Children's] welfare" and that termination of Mother's parental rights was appropriate based upon that ground.

Relative to Mother's alleged abandonment of the Children, the Tennessee Code provides, in pertinent part,

> (1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> * * *
>
> (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv). Under this ground of abandonment, the parent's incarceration "serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a substantial risk of harm to the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. The court may consider any relevant conduct that occurred prior to incarceration and is not limited to reviewing the four months immediately preceding the incarceration. *Id.* at 870-71. This court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68 (citations omitted).

Mother argues that her case is analogous with this court's decision in *In re Chase A.C.*, No. E2009-01952-COA-R3-PT, 2010 WL 3257711 (Tenn. Ct. App. Aug. 18, 2010). In that case, the trial court terminated father's parental rights, holding that father had abandoned the child by failing to provide a suitable home, that termination was warranted based upon father's substantial noncompliance with the permanency plan, and that the conditions which led to removal persisted. *Id.* at *14-16. This court reversed, holding that DCS had failed to make reasonable efforts to reunify the child with father. *Id.* at *24.

-11-

In contrast, the abandonment ground at issue in Mother's case related to her wanton disregard for the Children prior to her incarceration. Here, Mother was admitted to probation approximately three years prior to the filing of the petition to terminate her parental rights based upon felony and misdemeanor convictions. Mother had not provided the sole support for Zachary G. since he was approximately seven months old. Additionally, Kaleb M. had never resided solely in Mother's care. Mother contended that she provided the primary care for the Children even though she was on probation and the Children were in the custody of relatives. However, Mother admitted that while on probation, she had failed drug tests and was incarcerated periodically "for a month here or there." Indeed, when asked whether she was in good standing with her probation from 2007 until 2010, Mother stated that she "didn't pass that many" drug tests except for the one year period prior to her incarceration. During the majority of Mother's one year of sobriety, she was housed in rehabilitation facilities, while relatives or foster parents cared for the Children. Once she graduated to the transitional living program, she ingested an illegal substance, knowing that her actions could result in the revocation of her probation. Mother also knew that her actions violated the permanency plans because she had agreed to remain drug free and refrain from illegal activity.

While Mother accepted responsibility for her actions once she was incarcerated, her behavior prior to her incarceration evidenced a wanton disregard for the welfare of the Children. With all of these considerations in mind, we hold that Mother's probation violation, admitted repeated incarcerations, criminal behavior, substance abuse, and her continued failure to provide adequate support for the Children supported termination of Mother's parental rights based upon the ground of abandonment. Accordingly, we conclude that the trial court's finding that Mother abandoned the Children is supported by clear and convincing evidence. Thus, a statutory ground existed for termination of Mother's parental rights.

B.

Mother contends that the trial court erred in finding a ground of termination based upon her substantial noncompliance with the permanency plans. Mother alleges that she substantially complied with the requirements. DCS responds that the requirements contained in the permanency plans were reasonable and that while Mother completed some of the requirements, she "was in substantial noncompliance with the permanency plans' central obligations designed to achieve reunification."

Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related to the plan's goal. Tenn. Code Ann. § 37-2-403(a)(2)(A). A ground for termination of parental

rights exists when a petitioner proves by clear and convincing evidence that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan . . . ." Tenn. Code Ann. § 36-1-113(g)(2).

To establish noncompliance, the trial court must initially find "that the requirements of the permanency plans are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656; *see In re Valentine*, 79 S.W.3d at 547. When the trial court does not make such findings, the appellate court should review the issue de novo. *In re Valentine*, 79 S.W.3d at 547. Second, the court must find that the parent's noncompliance is substantial, *In re M.J.B.*, 140 S.W.3d at 656, meaning that the parent must be in "noncompliance with requirements in a permanency plan that are reasonable and related to remedying the conditions that warranted removing the child from the parent's custody." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). To assess a parent's substantial noncompliance with a permanency plan, the court must weigh "both the degree of noncompliance and the weight assigned to that particular requirement." *In re Z.J.S.*, 2003 WL 21266854, at *12. Conversely, "[t]erms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *In re Valentine*, 79 S.W.3d at 548-49.

Here, Mother was tasked with providing a safe and stable drug-free home, verifying that she had resided in a stable home for three months by submitting receipts relating to rent and utilities, maintaining a stable income and reliable transportation, refraining from illegal activity, resolving restitution from her 2007 convictions, remaining drug free, prohibiting persons under the influence of illegal drugs or alcohol from coming near the Children, and verifying completion of an eight-week parenting program. We believe that these requirements were reasonable and related to remedying the conditions that led to the Children's removal from the home. However, Mother simply failed to substantially comply with these requirements.

We acknowledge that prior to the relapse in 2010, Mother had made substantial progress and was a short time away from reuniting with the Children and that once incarcerated, Mother completed several additional programs relating to her addiction. While we commend Mother for completing various programs relating to her addiction, she simply failed to comply with the most important aspects of the permanency plans, namely to remain drug free and put herself in a position where she could adequately care for the Children. Mother knew that she was tasked with submitting to weekly drug tests to ensure her compliance with the permanency plans and that if she failed a drug test, her probation could be revoked, meaning that she would be incarcerated. Mother simply chose to ignore the potential consequences of her actions and put her desires above the needs of the Children

-13-

when she ingested an illegal substance, resulting in the revocation of her probation and incarceration. Accordingly, we conclude that while Mother attempted to comply with some of the requirements enumerated in the permanency plans, the trial court's finding that Mother was in substantial noncompliance with the permanency plans is supported by clear and convincing evidence. Thus, a second statutory ground existed for termination of Mother's parental rights.

C.

Mother alleges that her alleged noncompliance with the permanency plans was a result of DCS's failure to provide services and assist Mother in her efforts to reunite with the Children. DCS responds that Ms. Brown ensured that Mother had access to the necessary programs and followed up with those programs to ensure that Mother received the services related to her substance abuse problems. DCS notes that Ms. Brown also met with Mother and discussed the requirements with her.

Once a child has been removed from a parent's home, DCS is tasked with making it possible for the child to return home before instituting termination proceedings. Tenn. Code Ann. § 37-1-166(a)(2). At the termination proceeding, DCS must prove by clear and convincing evidence that reasonable efforts were made to reunite the child with the parent. Tenn. Code Ann. § 37-1-166(b). For purposes of DCS involvement, the term reasonable efforts refers to "the exercise of reasonable care and diligence by [DCS] to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). "The reasonableness of [DCS's] efforts depends upon the circumstances of the particular case." *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006).

"While [DCS's] reunification efforts need not be "herculean," DCS must do more than simply provide the parents with a list of services and send them on their way." *Id.* DCS "employees must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan." *Id.* These "employees have an affirmative duty to utilize their education and training to assist parents in a reasonable way to address the conditions that led to the child's removal and to complete the tasks stated in the plan." *In re R.L.F.*, 278 S.W.3d 305, 316 (Tenn. Ct. App. 2008). In keeping with this ideal, DCS must provide an affidavit, identifying its reasonable efforts, for the court's consideration. Tenn. Code Ann. § 37-1-166(c); *see In re R.L.F.*, 278 S.W.3d at 317. In determining whether the efforts used by DCS were reasonable, the court should consider the affidavit and the following factors:

(1) the reasons for separating the parent from his or her children,

-14-

(2) the parent's physical and mental abilities,

(3) the resources available to the parent,

(4) the parent's efforts to remedy the conditions that required the removal of the children,

(5) the resources available to [DCS],

(6) the duration and extent of the parent's remedial efforts,

(7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and [DCS]'s efforts.

*In re Giorgianna H.*, 205 S.W.3d at 519. However, "'[r]eunification of a family is a two-way street, and the law does not require [DCS] to carry the entire burden of this goal." *State Dept. of Children's Services v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006) (quoting *In re R.C.V.*, No. W2001-02102-COA-R3-JV, 2002 WL 31730899, at *11 (Tenn. Ct. App. Nov. 18, 2002)). "Thus, parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required [DCS] to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519.

Mother asserts that the court found at a previous hearing that DCS failed to make reasonable efforts to assist Mother. She believes that this finding was evidence that termination based upon Mother's substantial noncompliance with the permanency plans was erroneous. Having reviewed the document at issue, we believe the notation regarding the efforts expended by DCS was likely a clerical error. The notation occurred after the court had listed all of the services that DCS had provided and prior to the court's finding that DCS was in substantial compliance with the permanency plans. We therefore reject Mother's assertion that the court had found, at one point, that DCS failed to make reasonable efforts in assisting Mother. Moreover, the issue on appeal is not whether DCS had struggled at one point in its assistance of Mother but is whether DCS made reasonable efforts in reuniting the Children with Mother before instituting termination proceedings. Unfortunately, the trial court failed to make any finding regarding the efforts made by DCS at the termination proceeding or in the order terminating Mother's parental rights. Accordingly, we will review the issue de novo. *See In re Valentine*, 79 S.W.3d at 547.

The permanency plans at issue in this case were not particularly lengthy or hard to follow. Ms. Brown advised Mother on the steps she needed to take to reunite with the

Children. Mother had been provided with resources to help her remain drug free and to provide for the Children. Additionally, Mother had spent approximately nine months in programs geared toward assisting her with her addiction and reuniting her with the Children. Ms. Brown coordinated with these programs to ensure that Mother had access to the resources she needed. We believe that Ms. Brown did all that she could do to assist Mother and explain the steps of the permanency plans but that Mother simply failed to comply with the requirements that would have allowed her to reunite with the Children, namely to remain drug free and provide a home for the Children. Once Mother was incarcerated, Ms. Brown could not provide the assistance that Mother needed to provide a stable home for the Children. Indeed, Mother was tasked with serving a lengthy sentence and would likely need to endure months of rehabilitation following her release. Accordingly, we conclude that the record contains clear and convincing evidence that DCS made reasonable efforts to assist Mother in her attempts to reunite with the Children.

D.

Having concluded that there was clear and convincing evidence supporting each of the statutory grounds to terminate Mother's parental rights and that DCS made reasonable efforts to assist Mother in reuniting with the Children, we must consider whether termination of Mother's parental rights was in the best interest of the Children. In making this determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:
>
> > (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> >
> > (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> >
> > (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

-16-

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

In this case, a number of the best interest factors weigh against Mother. Despite her participation in the creation of several permanency plans, Mother refused to make the

changes necessary to adequately care for the Children. Tenn. Code Ann. § 36-1-113(i)(1), (2). The Children presently reside in a safe and stable foster home and have bonded with the foster parents. Removing the Children from the foster parents and returning them to Mother when she would be finally able to care for them would likely traumatize the Children. Tenn. Code Ann. § 36-1-113(i)(5). Questions remain as to whether the physical environment of Mother's potential home would even be healthy and safe because Mother's prior relapse occurred after she spent approximately nine months in rehabilitation. Tenn. Code Ann. § 36-1-113(i)(7).

Relative to Mother's relationship with the Children, Mother has not adequately cared for the Children since 2006. Zachary G. was approximately seven months old when he was removed, while Kaleb M. has never resided solely in Mother's care. Instead, the Children have been passed from relative to relative until they were eventually placed in foster care, while Mother was given every opportunity to better herself and provide a home for the Children. Mother participated in visitation with the Children while in rehabilitation programs; however, Mother had not seen or contacted the Children since May 2010. Tenn. Code Ann. § 36-1-113(i)(3), (4). We acknowledge that Mother's lack of visitation with the Children since her incarceration was the result of Ms. Brown's refusal to transport the Children to the prison. We must also acknowledge that until two weeks before the hearing, Mother had not contacted Ms. Brown to request visitation or to secure an avenue through which to contact the Children. Additionally, Mother has not consistently paid child support. Tenn. Code Ann. § 36-1-113(i)(9).

Mother argues that terminating her parental rights to the Children would result in the permanent separation of the Children from their sibling, Alexis G., who had just been placed in foster care. Mother states that the siblings would never be reunited if she were to regain custody of Alexis G. but lose her parental rights to the Children. We do not wish to discount the important bond between the Children and Alexis G. However, we cannot speculate as to whether Alexis G. will ever be returned to Mother, whose abandonment of the Children and repeated failure to comply with the requirements contained in the permanency plans provided adequate grounds for termination of her parental rights. Moreover, the evidence presented at the hearing reflects that the Children had bonded with their foster parents and had been separated from Alexis G. since April 2009, when Grandmother kept Alexis G. but sent the Children to live with Suzanne S.

With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the Children. Accordingly, we affirm the decision of the trial court.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary.  Costs of the appeal are taxed to the appellant, Heather M.

_____
JOHN W. McCLARTY, JUDGE